### JIM RAINER V. THE STATE.

No. 1872.   Decided June 12, 1912.

Rehearing denied June 28, 1912.

**1.—Murder—Declarations by Defendant—Res Gestae.**

Where, upon trial of murder, it appeared that the defendant made a declaration some fifteen or twenty minutes after the killing, to the effect that the officer should go down to the scene of the killing and see whether defendant's wife was dead and that if she was he would be satisfied, etc., and it was an issue in the case whether defendant had intended to kill his stepson or his wife, and everything indicated that defendant's mind was not detracted from the occurrence at the time and his statement was spontaneous and not broken by any intervening occurrence and was free and voluntary, there was no error in admitting same as a part of the res gestae. Following McKinney v. State, 40 Texas Crim. Rep., 374, and other cases.

**2.—Same—Evidence—Confession.**

Where defendant's confessions were in conformity with the statute, there was no error in admitting the same in evidence.

**3.—Same—Charge of Court.**

Where, upon trial of murder, the defendant contended that in trying to kill his stepson he killed his wife by mistake, and the court submitted this issue in a proper charge to the jury, and the evidence sustained the conviction of the defendant for the murder of his wife, there was no error.

Appeal from the District Court of Hill. Tried below before the Hon. C. M. Smithdeal.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

*J. E. Clarke,* for appellant.—On the question of admitting in evidence the declarations of defendant: Boothe v. State, 4 Texas Crim.

App., 211; Foster v. State, 8 id., 250; Stephens v. State, 20 id., 270; Geibel v. State, 28 id., 151; Bradberry v. State, 22 id., 278; Pierson v. State, 18 id., 562; Lindsey v. State, 35 id., 164; Ingram v. State, 43 S. W. Rep., 518; Mitchum v. State, 11 Georgia, 615, and cases cited in the opinion.

C. E. Lane, Assistant Attorney-General, and A. M. Frazier, County Attorney, for the State.—On question of defendant's declaration: Bronson v. State, 59 Texas Crim. Rep., 17, 127 S. W. Rep., 177; Powers v. State, 23 Texas Crim. App., 42, and cases cited in opinion.

HARPER, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at death.

1. The most serious question in the case, and the only one presented in appellant's brief, and which is very ably presented, is the one as to whether certain statements made by defendant after his arrest are res gestae. It appears that appellant and his wife had separated on several occasions. At the last separation, when she went to her brother's, she carried a cow, some meat and perhaps other things. Appellant had gone and gotten these things and carried them back home. He says he went to this house on the night of the homicide by invitation of the deceased. This is denied by the State's witnesses. It is conclusively shown when he went he carried a shotgun with him, and before going to the house he placed the gun in a closet at the rear of the house. After doing so he knocked at the back door, and being refused admittance he went to the front door and was admitted. Trouble arose, and he justifies his conduct by testifying to an assault on him by the fourteen year old son of deceased, he being appellant's stepson, in which he says his wife participated. The State's testimony would show that he assaulted his wife, and Mollie Scott says he was beating her, and she jerked loose and ran in the house, closing the door. He went away. Witnesses say that in talking to them he threatened to kill both his wife and her son that night. He says he went to her brother to get him to control the boy. The brother says appellant said nothing to him about the boy. He returned to Bosier's house where his wife was staying and tried to get in, but was refused admittance. Tom Allen was there, and when they would not let him in, appellant tried to get Tom to knock and get the door open so he could rush in. This Tom refused to do. Appellant then said he was going to get his gun. He made threats to this witness, Jessie Adams and Eliza Davis that night about what he was going to do. He later went to the closet, got his gun, returned to the house, demanded admittance, and when refused, knocked out a panel of the door, shoved his gun in the opening, fired and killed his wife. He says, while testifying as a witness, he did not intend to kill his wife, but intended to shoot his stepson. After the shooting he started down the street and met James Hamilton near the scene, who says appellant

remarked to him, "Come and go back with me, I shot in the house there and I think I shot Francis." Francis was his wife. Hamilton says he told him if he would give him the gun he would go with him, otherwise he would not, when appellant gave him the gun. They went back to Bosier's house, and appellant called his stepson; getting no reply Hamilton remarked to appellant that they were afraid of him, when the stepson said, "Yes, I am afraid," when Hamilton told him he had the gun. The boy opened the door and run out, when appellant went in, and when he came back out said he was going to give up, and wanted the gun. Hamilton refused to give it to him, when appellant said he wanted to see Nathan Ferrell and tell him what to do with the stock. That he started with him, when appellant said he traveled too slow, and went on and came back and went in the house where his wife was again, and when he came out, said: "Yes, she was sure dead and he was satisfied." They then started to the officer, appellant saying he was going to give up. Appellant again remarked that Hamilton walked too slow, and appellant hurried on. Sheriff Freeland says it is between a half and three quarters of a mile from the house where the killing occurred to the point where appellant came to him and surrendered. He immediately turned him over to Jailer Robinson, and Mr. Robinson testified that when he opened the jail door and told appellant to go in, appellant said: "Mr. Robinson, I want you and Mr. Freeland to go down and see if she is dead, and if she is come back and tell me, and if she is dead I will be satisfied—let the mob come in the morning." Chas. Cavanaugh was present and testified that appellant asked Mr. Robinson and Mr. Freeland to go over to the house and see if his wife was dead and said, "if she is I am satisfied, and you can let the mob come in the morning." This was shown to have been some fifteen or twenty minutes after the killing took place.

Appellant earnestly insists that this testimony is not admissible, and as he testified on the trial that he shot at and intended to kill his stepson, which if true, as he did not kill him, but killed his wife, a person not intended, he would only be guilty of murder in the second degree, and this statement was material and very damaging, for it tended to show that he shot at and intended to kill his wife, which would make him guilty of murder in the first degree. It is also urged that without this testimony the jury would not be authorized to so find under the evidence. Without discussing that feature, we will consider whether or not the testimony of Cavanaugh and Robinson was properly admitted, for there can be no question of its damaging nature, and if inadmissible the case should be reversed. In his brief appellant cites us to many authorities, and we have carefully reviewed them all. Among them is section 262 of Wharton on Criminal Evidence wherein that learned author says:

"Res gestae are events speaking for themselves through the instinctive words and acts of participants, not the words and acts of

participants when relating the events. . . . Nor are there any limits of time within which the res gestae can be arbitrarily confined. They vary in fact with each particular case. . . . They need not be coincident as to time if they are generated by an excited feeling which extends without break or let down from the moment of the event they illustrate. In other words, they must stand in immediate casual relation to the act, and become part either of the action immediately producing it, or of action which it immediately produces. Incidents which are thus immediately and unconsciously associated with an act, whether such incidents are doings or declarations, become in this way evidence of the character of the act." (Whart. Crim. Ev., 8 ed., secs. 262 and 263.) Again he says, "but we must remember that continuousness can not always be measured by time." (Id., sec. 264.) And again, "instinctiveness is the requisite, and when this obtains the declarations are admissible." (Id., sec. 691.)

To the citation referred to by appellant we have added some excerpts from other sections of the work of the same author.

We are also referred by appellant to the case of Lewis v. State, 29 Texas Crim. App., 204, wherein Judge Willson, speaking for this court, said: "In order to constitute declarations a part of the res gestae it is not necessary that they were precisely coincident in point of time with the principal fact. If they sprang out of the principal fact, tend to explain it, were voluntary and spontaneous, and made at a time so near it as to preclude the idea of deliberate design, they may be regarded as contemporaneous, and are admissible in evidence."

We are also referred by appellant to the cases of Bronson v. State, 59 Texas Crim. Rep., 17, 127 S. W. Rep., 175; Ingram v. State, 43 S. W. Rep., 518; Fulcher v. State, 28 Texas Crim. App., 465; Stagner v. State, 9 Texas Crim. App., 456, and other cases, in which the rule announced by Mr. Wharton and Lewis v. State, above quoted from, is approved and applied to the facts in those cases. In the case of McGee v. State, 31 Texas Crim. Rep., 71, it was held: "Nor is there any limit of time in which the res gestae are arbitrarily confined. They vary with each particular case. They need not be coincident as to time if they are joined by the existing feeling which exists, without break or let down, from the moment of the event they elicit." As said in many cases in this court, the rule is plain and explicit; the only troubles comes in the application of the rule to the particular facts in the case. In this case, was there what would be termed a "break or let down" from the time the shot was fired until the statement was made to Mr. Robinson? Was appellant's mind detracted from the events, or does his acts indicate that his mind had become cool and calculating, measuring what he might say? We think not. From the time that the shot was fired until he made the statement he seemed but to have in mind nothing but the ascertainment of whether or not she was dead, and his surrender to the officers. The statement made often bears strong evidence of whether a person is speaking under the

impulses engendered in the conflict, and is of that spontaneity that shows the mind is still under the same influence that governed and predominated it at the time the event took place.

In the case of Freeman v. State, 40 Texas Crim. Rep., 545, 51 S. W. Rep., 230, it was held: "In the very able and exhaustive brief filed by appellant he urges that the length of time between the time deceased was cut and the statement made, being about sixty minutes, is a circumstance tending to show that the statement was not res gestae; that in addition to this, appellant went about other things; that he sent for a doctor; that he asked the witness Newberry to open his saloon door, and get his keys out of his pocket for that purpose; that he then remarked he was about to faint, and sat down on the gallery; that after this he did faint and was removed into the saloon; that after consciousness was returned, his wound was dressed, and in about fifteen minutes thereafter made the statement." The court held the statement was res gestae and admitted it. As was said in that case, it was going about as far as any published case, and we are, individually, rather inclined to agree with Judge Henderson when he said it was extending the rule most too far; but in this case there is nothing to show that appellant's mind was detracted from the occurrence, but everything indicates and would show there was no break or let down, but on the other hand it was but a spontaneous outburst, springing out of the transaction, and the words themselves preclude any idea of design or fabrication, and as that was voluntarily made, not elicited by questions, suggestions or other act of any person other than himself, we hold that the court did not err in admitting it as a part of the res gestae of the transactions. For other cases so holding see McKinney v. State, 40 Texas Crim. Rep., 374; Castillo v. State, 31 Texas Crim. Rep., 152; McGee v. State, 31 Texas Crim. Rep., 74; Miller v. State, 31 Texas Crim. Rep., 637; Freeman v. State, 40 Texas Crim. Rep., 545; King v. State, 34 Texas Crim. Rep., 238, and cases cited in these opinions. And in Craig v. State, 30 Texas Crim. App., 621, a list of cases in other jurisdictions were cited, approving the rule that "if the declarations appear to spring out of the transaction, if they elucidate, if they are voluntary and spontaneous, and made at a time so near to it as reasonably to preclude the idea of design, then they are to be regarded as contemporaneous. Mitchum v. The State, 11 Ga., 615. This is supported by the following authorities: The State v. Wagner, 61 Me., 178; Comfort v. The People, 54 Ill., 404; Denton v. The State, 1 Swan, 279; Crookham v. The State, 5 W. Va. 513; Handy v. Johnson, 5 Md., 450; Goodwin v. Harrison, 1 Root, 80."

2. There is also a bill of exceptions in the record complaining of the confession of defendant made to Mr. Frazier, county attorney, the morning after the killing. As bearing on this question, on cross-examination, before the introduction of the confession, defendant himself testified:

"You told me the first thing that I didn't have to make any statement concerning the case and that any statement I did make you wanted to be freely and voluntarily made. I think you told me that any statement I made could not be used as evidence for me but that it might be used as evidence against me on the trial of the case concerning which the statement was made. I made every statement that was written in that paper except one, and I said it was correct. There is one statement in there that I told Mr. Robinson and told you then that if I made it I didn't remember it. You read that statement over to me and I saw it. You read it to me just like it is here, and I signed it. There was something that I said concerning the case which I did not put in the statement and you didn't put it in."

The statement that defendant says he did not remember making to Mr. Robinson is not in the confession, but it is stated that if he made such statement he did not remember it just as he testified on the trial. The confession is in conformity with the statute in form, and there was no error in admitting it.

3. The grounds in the motion for a new trial complaining of the charge of the court present no error. The only serious contention in the case is that appellant tried to kill his stepson and killed his wife by mistake, and on this issue the court charged the jury: "If the defendant shot at James Allen with intent to kill him and without intent to kill Francis Rainer, yet if you believe from the evidence beyond a reasonable doubt that he did kill Francis Rainer, and that the shot was fired at James Allen, if it was, under such circumstances as to have made the killing of James Allen, if he had been killed by the shot, murder of the first or second degree, then the killing of Francis Rainer would be murder in the second degree." And we might add that the evidence fully supports their finding. The record as a whole would disclose that the animosity of appellant was in the main towards his wife, and whatever ill-will he had towards the boy was occasioned by the acts of the boy in aiding and assisting his mother. Witnesses testify that appellant was saying he was going "to kill all three that night, and then he would not get more than a life sentence." The jury seems to have decided otherwise for taking the life of only one of the three, and assessed the death penalty. His wife and stepson try to keep him out of the house; he returns time and again, breaks in the door, and slays his wife. It is strange, if it was the boy he was after, as soon as the life of his wife is taken, although the boy is still in the house and he makes no other effort to harm him, although he still had the gun in his hands, and there were none there to say him nay. We are of the opinion that the jury was justified in their finding that it was the life blood of his wife he was craving.

The judgment is affirmed.

*Affirmed.*

[Rehearing denied June 28, 1912.—Reporter.]