## T. J. CLAY v. THE STATE.

### No. 2326.   Decided June 11, 1902.

**1.—Murder—Provoking Difficulty—Mutual Combat—Charge of Court.**

On a trial for murder, where it appeared that the parties had had a previous difficulty, which was ended, and that deceased, at the time and before he left the scene, had said to defendant, "it was not all over," and that he would see him later, but fixed no time, terms or place of meeting, and defendant, in effect, replied, "it was all right;" whereupon deceased went to his place of business, and defendant, after having gone to one or more places, returned to the place where the original difficulty occurred and, about twenty minutes having elapsed, was standing there engaged in conversation with a third party when deceased reappeared, and seeing him, began drawing a pistol, which movement having been seen by defendant, he immediately drew his pistol and both parties fired, deceased being killed.   Held, the court erred in limiting defendant's right of self-defense by a charge upon provoking the difficulty, and also erred in charging upon mutual combat, neither of these questions being issues raised by the evidence.

**2.—Same—Self-Defense.**

Under the facts stated in the foregoing paragraph, there was a clear abandonment of the original difficulty by defendant; and the act of deceased, going off to his place of business, arming himself and again seeking defendant and renewing the difficulty, made him clearly the aggressor in the second difficulty; and after his abandonment of the first difficulty, defendant's right of self-defense was perfect and fully restored; and he did not lay himself liable to the law of mutual combat by remaining on the streets, where the law justified him in being, it not requiring him to abandon the streets in order to avoid meeting his assailant.

**3.—Same—Evidence—Acts and Declarations of Deceased.**

Evidence of the acts, conduct and declarations of deceased, which occurred while he was absent after the first difficulty at his place of business, and which were not known to defendant, were inadmissible in evidence against defendant.

**4.—Same.**

On a trial for murder, where one of the issues was as to whether defendant killed deceased with his own pistol or with a pistol he had borrowed after his previous difficulty with deceased, it was competent for defendant to prove that the identical number on the pistol was the same as the one bought by him of hardware merchants during the month of March, previous to the killing.

Appeal from the District Court of Upshur, on change of venue from Smith County.   Tried below before Hon. J. G. Russell.

Appeal from a conviction of murder in the second degree; penalty, twenty-one years imprisonment in the penitentiary.

Vol. 44 Crim. Rep.—9

Appellant was charged by the indictment with the murder of Will Griffin, in Smith County, on the 24th day of June, 1901, by shooting him with a pistol.

The essential facts which brought about and were attendant upon the killing are fully stated in the opinion.

*Barnwell & Eberhart* and *Johnson & Edwards,* for appellant.—The testimony for the State as well as that adduced by the defendant showed without conflict that appellant killed the deceased in the actual and necessary defense of himself against a deadly attack with a pistol then being made or about to be made upon him by the deceased; and he was prosecuted and convicted of murder solely upon the idea that he had forfeited his right of self-defense by "provoking the difficulty" and by engaging in a "mutual combat."

If at the time of the shooting appellant had not forfeited his right of self-defense, if he was not required by the law either to retreat or to stand and let Griffin kill him, then it is manifest from the testimony that he killed Griffin in the actual and lawful defense of himself from impending death or serious bodily injury.

Appellant was not deprived of his right of self-defense by reason of having provoked the difficulty, because (1) the proof shows without controversy that deceased provoked and brought on the difficulty in which he was killed, and the proof fails to show that appellant provoked the first difficulty, or whether he or deceased provoked it; (2) if appellant provoked the first difficulty, there is a total absence of evidence to show that he provoked it, and the evidence renders it manifest that he did not provoke it, in order to obtain a pretext to kill the deceased; (3) if appellant provoked the first difficulty, it is clear from the testimony that he had completely abandoned the same; that the same was a thing of the past and that Griffin knew it; that the parties had separated and gone in opposite directions and Griffin was entirely beyond danger from appellant, and that appellant was giving attention entirely to other matters, when the deceased came upon him suddenly and was in the act of shooting appellant, when his attention was attracted to him and he quickly drew his pistol and killed him. Brazzil's case, 28 Texas Crim. App., 584; Lindsey's case, 32 S. W. Rep., 768; Airhart's case, 51 S. W. Rep., 215; Johnson's case, 66 S. W. Rep., 845.

Appellant was not deprived of his right of self-defense by reason of having entered into a mutual combat with deceased, because the testimony makes it clear that he did not willingly or voluntarily enter into the combat with deadly weapons, but that he merely exercised a right which is above statutes and constitutions, to wit, his right of self-defense. The evidence fails to show that appellant at any time agreed or consented to enter into any kind of a fight with deceased, and it certainly fails to show that he at any time agreed or consented to engage with him in a fight with deadly weapons. But if it be held that there is evidence to warrant a finding that appellant agreed to fight with

deadly weapons, or agreed to fight at all, there is certainly no testimony to warrant a contention or support a finding that appellant did in fact enter into the fatal conflict with deceased voluntarily, willingly and mutually; for the testimony shows without conflict that appellant was standing peaceably where he had a right to be, in peaceable conversation, and neither looking for deceased nor paying any attention to him, when deceased came suddenly upon him and, even before appellant saw him, was in the very act of shooting him with a pistol, and would doubtless have killed appellant had not a bystander called his attention to his impending peril. Appellant did not voluntarily or willingly enter into the deadly conflict; deceased gave him no option but to be killed or to defend his life. Schauer's case, 60 S. W. Rep., 249; Stringfellow's case, 61 S. W. Rep., 719.

If appellant provoked the first difficulty in order to obtain an opportunity to kill the deceased, does not the proof show beyond question that he had completely abandoned it, that the difficulty and Griffin's danger were entirely passed, when Griffin sought appellant, came upon him suddenly and was in the very act of shooting him when appellant's attention was attracted to him? Brazzil's case, 28 Texas Crim. App., 584; Lindsey's case, 32 S. W. Rep., 768.

Appellant was not deprived of his right of self-defense by reason of engaging in a mutual combat unless he entered into the fatal conflict willingly and voluntarily, and not merely to defend himself against Griffin's attack; to be deprived of the right to protect his life, he must have agreed with Griffin to engage in a fight with deadly weapons, and must have actually engaged in the same willingly and voluntarily.

We invite attention to the following cases: Stringfellow's case, 61 S. W. Rep., 719; Schauer's case, 60 S. W. Rep., 249; Everett's case, 30 Texas Crim. App., 682; Brazzil's case, 28 Texas Crim. App., 584; Wills' case, 22 S. W. Rep., 969; Lindsey's case, 32 S. W. Rep., 768; Grayson's case, 57 S. W. Rep., 808; McCandless' case, 57 S. W. Rep., 672; Cartwright's case, 14 Texas Crim. App., 498; Stewart's case, 51 S. W. Rep., 907; Phipps' case, 31 S. W. Rep., 397; Wrage's case, 54 S. W. Rep., 602; Walters' case, 35 S. W. Rep., 652; McGlothlin's case, 53 S. W. Rep., 871; Ball's case, 29 Texas Crim. App., 125; Simmons' case, 31 Texas Crim. Rep., 227; Morgan's case, 34 Texas Crim. Rep., 222; Airhart's case, 51 S. W. Rep., 214; Carter's case, 37 Texas Crim. Rep., 403.

If appellant left the place of the difficulty, having abandoned it, and within a short time returned to the same, armed and having either the intention to provoke a difficulty with deceased and to kill him, or the intention to enter into a mutual combat with deceased and to kill him in the event he should engage in the same, still, if after appellant so returned to the place of the difficulty he neither did nor said anything intended or calculated to bring on a difficulty with deceased, and if he did not in fact voluntarily and mutually engage in a combat with deceased, but if deceased returned and attacked appellant with a pistol in such manner as to put him in reasonable fear of death or serious bodily

injury, and if appellant then, in defense of his own life or person, slew the deceased, the homicide was justifieable.

*Briggs & `Briggs, March, McIlwaine & Fitzgerald, R. W. Simpson,* District Attorney, and *Rob't A. John,* Assistant Attorney-General, for the State.—The evidence makes out two states of facts under either one of which appellant is estopped and precluded from relying upon the law of necessity. Clay, who was greatly superior to Griffin physically, upon slight, if indeed any provocation, committed an assault upon him, inflicting wounds and indignities calculated to excite and anger him. He had reason to believe and was informed by Griffin that he would resent such treatment. Griffin's experience of a few minutes previous had demonstrated that he could not cope with Clay in a physical contest. When he arose from the pavement with blood running down his face he confronted Clay and told him he was coming back and see him again. To which Clay replied that "he could bring any one in the house he wanted to with him." To which Griffin answered, "I don't need anybody; I am enough." And Clay replied, "All right, I will be here." However much the witnesses may differ as to the language there passed between them, the fact remains that Clay and Griffin understood each other, for each of them left almost immediately, going in opposite directions, and shortly thereafter both returned armed with deadly weapons to the very spot, Clay coming back first, and continued the conflict begun. Even the witnesses Wynne, Spear, White and Tom Knight, who were cognizant of what had passed between them, to use the language of Spear, were "expecting a tragedy from what had occurred."

Did Clay, knowing of the inflamed condition of Griffin's mind, and believing that he would resent his treatment of him and arm himself and return and engage him in a deadly encounter, go off and arm himself and return to the scene of the difficulty with the intention of killing said Griffin should he return and engage him in a deadly conflict?

Having provoked Griffin by assaulting him, and having reason to believe and expecting that, enraged and excited, he would resent it by a deadly assault, did Clay arm himself and put himself in Griffin's way, or return to the scene of the difficulty for the purpose and with the intent of shooting Griffin should he return and draw or attempt to draw his pistol for the purpose of shooting him, and did he so shoot and kill him? In a very short time after their passage of words and separation they both returned to the place of the first difficulty, Clay getting back first, and promptly re-engaged in the conflict with deadly weapons. Clay did nothing which would indicate to the deceased or notify him that he had abandoned the difficulty. He came back to the place where the deceased was expecting to find him. In that position he awaited the return of his antagonist, and upon his reappearance the difficulty was re-engaged in. "He can not avail himself of a necessity which he has knowingly and willfully brought upon himself."

Again, the evidence shows that after the first difficulty appellant volun-

tarily and willingly agreed to engage with the deceased in a combat with deadly weapons, knowing that it might result in the death of Griffin or himself, and that they did so fight and Griffin was killed. After Clay assaulted Griffin and Griffin faced him and challenged him, they both left, going in opposite directions, and in a short time afterwards returned armed with deadly weapons to the scene of the conflict, Clay getting back first, and fought it out, Griffin being killed.

Mutual combat was one of the issues in the case, and the evidence was ample to warrant the court in submitting it to the jury. The charge of the court was a correct enunciation of the law of mutual combat as applicable to the facts of the case. Gardner v. State, 59 S. W. Rep., 1114.

If the evidence, the admission of which is complained of, was immaterial, in the light of the other evidence in the case it could have had no criminative force and was not prejudicial to the defendant. Jinks v. State, 35 Texas Crim. Rep., 365; Massey v. State, 31 Texas Crim. Rep., 371; Hooper v. State, 29 Texas Crim. App., 614.

The statement of deceased to witness Mansfield, to the effect that he was nervous and that his head hurt him like it would burst, elicited by the question objected to, could in no way have influenced the verdict of the jury. The record shows that other witnesses testified to appellant slapping deceased down and "chugging" his head against the concrete pavement, some of them say as many as five or six times. That considerable force was used; that they could hear the licks; that his head was considerably cut and that blood ran down off of his forehead and face; that Griffin seemed "addled" or "dazed" from the punishment he was subjected to.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of twenty-one years.

In the city of Tyler, in one of its must public places, where, by reason of a barber shop, saloon, drugstore and soda fountain, large numbers of people were in the habit of congregating, this killing occurred about 6 o'clock in the evening. Deceased, Griffin, was an employe of Mayer & Schmidt, merchants, being their collector and assistant bookkeeper. About half an hour previous to the homicide deceased approached appellant at about the point where the killing subsequently occurred, and presented for collection a bill for $47. Appellant was entitled to a credit on this account of $4. Deceased had credited it on the books at the store, but had failed to place it on the account. Just what occurred between the parties in regard to this matter is in doubt. The parties were standing close together, and Griffin, with his collection book in his hand, was shaking it at Clay, indicating that he was angry. One or two witnesses testify to a vulgar expression by defendant, insulting in its character, to Griffin. Deceased replied, "Yes, I will;" and appellant then slapped Griffin on the left side of his head or face with his

right hand, knocking him over on the sidewalk. He then got on or hold of him, and either rubbed his head on the pavement or bumped it a time or two against it. Some of the witnesses say this produced an abasion; some a blue-looking appearance on his forehead, while others state it brought blood. Assuming an erect position, deceased remarked, "Gentlemen, you see the effect of presenting this man a bill." Dr. Wynne testified, that Griffin and Clay passed a few words about the time Griffin got up. Some one handed him his hat, and he said to Clay, "I will come and see you again," and Clay said, "All right, bring anybody else you want to from the house." Another testified, that Griffin said, "I will go and come back and see you." And Clay said, "Bring anyone else you want to see me." Griffin said, "I don't need anyone else with me; I am enough myself." Clay said, "All right, I will be here waiting for you," or words to that effect. Parker testified, that when deceased was brusing the dirt from his hat, he pointed his finger at Clay and said, "It is not over," and Clay said, "That is all right; I will be ready." Griffin then left. Upon cross-examination he was not so positive about the latter expression; that is, that Clay said he would be ready, but that was his impression; but he knew he said "All right." Partin testified, that Griffin, after he got up, said to Clay, "I will see you later," but did not hear Clay make any remark. White testified, that he heard Griffin say, "I will see you again," but did not hear Clay say anything in reply. There is considerable confusion in the testimony as to what was said by the parties immediately after Griffin resumed his feet. It is conceded that deceased said, "It was not all over;" that he "would see Clay again," and defendant, in effect, told him "it was all right." In effect, the conclusion reached from the testimony may be summed up by stating that deceased notified him he would see him again about the trouble just ended, and defendant left it optional with deceased. After making these remarks, deceased went west to the mercantile establishment of Mayer & Schmidt, about 185 feet distant. Knight testified, that after deceased left, and while at or near the spot where the difficulty occurred, appellant stated, that he was sorry he had hit that boy, but he had as good as called him a liar, and he ought to have known at the time that if he did that he would not take it. Appellant also stated, "I called him a boy, but he is a man." Clay would weigh from 200 to 225 pounds; deceased from 115 to 135 pounds—a wiry, active young man, inferior in strength to appellant. Within about ten minutes after deceased left the scene of the first trouble, appellant, in company with Schuh, went east, or in the opposite direction from that taken by deceased, about 650 feet, to the National Saloon, took a drink, and returned to the place where the original difficulty occurred and where the tragedy was enacted. After reaching this point, appellant went into what is called the Ruby Saloon, called over the phone the workman who was building his house, and talked with him about some matters connected with the house; and then returned to the sidewalk. He went to the edge of it, and turned facing the building, with

one foot in the gutter and the other on the edge of the sidewalk, leaning against or standing by an awning post, shown to be about six inches square, talking to Bailey. There was a considerable crowd on the sidewalk, when deceased was seen approaching from the west. It seemed the crowd expected a difficulty. Deceased seemed to be looking for somebody, and when he discovered appellant, turned facing him and began drawing his pistol. There is evidence that some one in the crowd hallooed to appellant, "Look out, Tom." It seems that up to this time he had not seen deceased. Looking up, and seeing the movement of deceased, appellant immediately drew his pistol. Deceased was delayed in getting his pistol out by reason of its catching in his clothes, thus enabling appellant to shoot at the same time, if not a little previous to deceased. There were six shots fired, two by deceased and four by appellant. Three shots took effect in the body of deceased, and one in the arm of a bystander. As deceased fell, or just after he fell, and while upon the ground, appellant fired a shot into his prostrate body. It is conceded that deceased at that time was dead. The testimony is very voluminous, but it occurs to us this is a sufficient statement of the facts to bring in review the questions raised upon the charges.

The court submitted the issue of self-defense, but limited it by a charge on provoking a difficulty. He also burdened the right of self-defense with the issue of mutual combat. The theory of the State was that Clay, being physically very superior to deceased, upon slight provocation committed an assault upon him, whereby wounds and indignities, which were calculated to anger and excite him, were inflicted; that he had reason to believe and was informed by Griffin that he would resent this treatment; that Griffin, with the experience before him of that difficulty, knew he could not cope with Clay in a physical contest, and that he informed Clay he would see him later; and when Clay stated to him that it was all right, he would be ready, etc., that was tantamount to an agreement to meet him in combat at that particular point with deadly weapons. It may be a serious question and very uncertain as to who provoked the first difficulty. But concede to the State its strongest possible contention, that is, that appellant provoked the first difficulty, and was in the wrong, it is certain this difficulty was at an end. The acts and language of both parties demonstrate this, as does all the evidence. Deceased provoked and brought on the second difficulty with deadly weapons. Under these circumstances self-defense revived to appellant. It will be observed that the threat of deceased was a general one, and fixed no time, terms nor place of meeting. It was to be such a meeting as deceased would impose, and left no option with appellant. To have required defendant to leave the place, or refrain from being where the first difficulty occurred, in order to avoid meeting deceased, would have imposed on him the duty of retreating in order to avoid meeting his assailant, if he should return. Their rights on the streets were equal; and he did not lay himself liable to the law of mutual combat by being at a place or going to a place where the law justified him in going. The

law does not require a party to abandon the streets at the behest of his adversary; nor does it require him to avoid him. Without quoting the charges of the court in reference to provoking a difficulty, or mutual combat, we are of opinion that neither issue is in this case. There was a clear abandonment of the original difficulty, at least by appellant. The acts of deceased—going to the establishment of his employers, and there arming himself, seeking appellant, and renewing the difficulty, made him clearly the aggressor in the second trouble. Brazzill v. State, 28 Texas Crim. App., 584; Lindsey v. State, 35 Texas Crim. Rep., 164; White's Ann. Penal Code, sec. 1215. After the abandonment of the difficulty, the rights of appellant under the law of self-defense were perfect and fully restored. See the same authorities. That the court was in error in charging upon mutual combat, and that such charge was not applicable to the facts of this case, see Everett v. State, 30 Texas Crim. App., 682; Brazzill v. State, 28 Texas Crim. App., 584; Lindsey v. State, 35 Texas Crim. Rep., 164; McCandless v. State, 42 Texas Crim, Rep., 31; Ball v. State, 29 Texas Crim. App., 125; Stringfellow v. State, 42 Texas Crim. Rep., 588, 2 Texas Ct. Rep., 232; Schauer v. State, 1 Texas Ct. Rep., 387. A discussion of the terms of the charge on mutual combat and provoking a difficulty is pretermitted because the evidence does not suggest either issue. This view of the case will suggest to the court upon another trial, if it should occur, a proper presentation of the law of the case.

Mansfield testified that shortly after the first difficulty, and about twenty minutes before the last, deceased came where witness was in the bookkeeper's office in the rear portion of Mayer & Schmidt's; that witness was a bookkeeper and deceased assistant bookkeeper and collector for said firm. When deceased came into the bookkeeper's office, he went to the rear portion of said office, where there was a desk, in a drawer of which witness had previously seen a pistol which resembled the pistol now shown witness. This was the weapon used by deceased in the difficulty. The witness had not seen this pistol for some time before the killing, and did not see deceased get the pistol that day. That deceased went out of the office and into a closet where there was a wash basin. The district attorney then asked witness if deceased made any request of him. Being assured in the affirmative, he was asked to state it. The answer was that deceased requested him to add up slips or tickets showing the daily sales of the clerks in said store, which was a part of the work assigned deceased. Witness was further asked if deceased assigned any reason for desiring him to add up said slips; and, over objection, was permitted to state that deceased stated he was so nervous he could not do it; that his head hurt him like it would burst. Bill of exceptions was reserved. The exception was well taken. Appellant was not bound by what occurred between these parties, or the reason for any of deceased's acts or statements at that point. These things could not affect defendant, because unknown to him. Wooley v. State, 3 Texas Ct. Rep., 236; Adam v. State, 3 Texas Ct. Rep., 314; Brumley v. State,

21 Texas Crim. App., 222; Johnson v. State, 21 Texas Crim. App., 206; Ball v. State, 29 Texas Crim. App., 107; Fuller v. State, 30 Texas Crim. App., 559; Gilcrease v. State, 33 Texas Crim. Rep., 619.

Upon the trial a question was raised as to whether the pistol with which appellant did the killing was his own or a borrowed one. The State's theory was that when he and his friend Schuh left the scene of the first difficulty, and went off towards the National Saloon, he secured a pistol from Schuh. It was also a question whether he had the pistol on at the time of the first difficulty or secured it between the first and second difficulty. Defendant had bought a pistol from Adams & Wiley, hardware merchants in Tyler, during the previous March. These merchants kept the number on pistols they bought from Baldwin & Co. of New Orleans and sold to their customers. However, it seems the number upon each of two pistols bought by them and sold in Tyler was omitted by Baldwin & Co. in making out their invoice. When this question came up, the sheriff of the county sought to trace the pistol for some purpose thought by the State to be material or connected with the case, and requested Adams & Wiley to trace the matter. They did so. Baldwin & Co. sent them through the mail the information desired. The number of one of the pistols thus sent was the identical number upon the pistol they had sold appellant in March. The State urged various objections to this evidence; and it was excluded. We believe this testimony should have gone to the jury. The State seemed to lay stress upon the fact that defendant may have armed himself between the difficulties, and that he did so with a borrowed pistol. Appellant's contention was that it was his own pistol, and that he had it at the time of the first difficulty. In view of another trial, we would observe, if this is an issue, the testimony should be admitted.

For the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*